# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PHYLLIS E. INFUSINO,           )
                                     )
           Plaintiff,          )
                                     )
v.                               )     Case No. 12 CV 3852
                                     )
CAROLYN W. COLVIN, Acting     )     Judge Robert M. Dow, Jr.
Commissioner of Social Security,   )
                                     )
           Defendant.       )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff Phyllis Infusino's motion for summary judgment [9]. Plaintiff seeks judicial review of a decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration,[1] denying Plaintiff's application for disability insurance benefits. Plaintiff asks the Court to reverse the decision of the Administrative Law Judge denying her benefits or, alternatively, remand for further proceedings. Defendant filed a memorandum in support of the Commissioner's decision. For the following reasons, the Court grants Plaintiff's motion [9] in part and remands this case for further proceedings consistent with this Opinion.

## I.    Facts

### A.    Procedural Background

On November 24, 2008, Plaintiff filed an application for disability insurance benefits, alleging an onset date of August 1, 2005. Administrative Record ("R.") at 62, 141. Her request was denied initially on April 22, 2009, R. at 64-68, and upon reconsideration on October 13,

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), Carolyn W. Colvin automatically substituted for Michael J. Astrue as defendant when she became the Acting Commissioner of Social Security on February 14, 2013.

2009.  R. at 69-72.  Plaintiff retained an attorney, R. at 95-98, 132, and timely requested a hearing.  On October 22, 2010, Plaintiff, her attorney, and a vocational expert appeared at a hearing before an Administrative Law Judge ("ALJ").  R. at 27.  In a decision dated November 23, 2010, the ALJ concluded that Plaintiff is not disabled.  R. at 10.

Plaintiff timely sought a review of the ALJ's decision, which the Appeals Council denied on March 22, 2012.  R. at 1.  The ALJ's decision thus became that of the Commissioner pursuant to 20 C.F.R. § 404.981.  R. at 1.  Plaintiff now seeks judicial review of the Commissioner's decision.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II.    Facts

### A.    Background

Plaintiff was born May 17, 1953, and was fifty-two years old on her alleged onset date. R. at 141.  She worked at a phone company for more than thirty years and took an early retirement/buyout in 2005 when her job title was eliminated.  R. at 32, 51, 435.  She also stated that she stopped working due to her major depression, panic attacks, and anxiety disorder.  R. at 182.  In January 2006, Plaintiff began an adult fast-track program for an Associate of Arts degree from the College of DuPage, attending class one night per week for two years.  R. at 31, 435. She graduated with a major in general studies in May 2008.  R. at 31.

### B.    Medical Evidence

The medical evidence in this case documents a host of chronic conditions, including obesity, a heart condition, high cholesterol, chronic obstructive pulmonary disease (COPD), obstructive sleep apnea, and Graves' Disease.  See R. at 33 (SA), 44-45 (obesity), 198 (SA), 293-94, 442.  Those conditions generally are well-controlled, however; Plaintiff's alleged disability in this case is based primarily upon her struggles with depression, anxiety, and panic attacks.  R.

at 33, 98; [10] at 1. The Court therefore follows the lead of the parties and confines the discussion to the medical evidence documenting Plaintiff's mental illness.

Plaintiff first was hospitalized and treated for depression in 1984 or 1985, at which time she began outpatient therapy to address issues concerning her children and troubled (now former) marriage. R. at 434, 454, 457. Plaintiff ceased attending therapy in 1993, R. at 454, 457, but resumed in 1997 after a 6-8 week inpatient psychiatric hospitalization. R. at 434, 454. Plaintiff began seeing her treating psychiatrist, Dr. Fatima Ali, around that same time. R. 185, 209, 409. Plaintiff was hospitalized in 2000 and 2003 after experiencing "stress breakdowns." R. at 199, 209, 434. Those hospitalizations each lasted 3-4 weeks. R. at 434. After her 2003 hospitalization, Plaintiff began biweekly outpatient therapy with Sue Perry, a Licensed Marriage and Family Therapist ("LMFT"). R. at 57-58, 202, 457.

Plaintiff's medical evidence dates to June 16, 2008. See R. at 279-87. On that date, her treating psychiatrist, Dr. Ali, noted that Plaintiff faced unspecified but "severe" psychosocial stressors and performed a psychiatric evaluation. R. at 284. Dr. Ali assigned Plaintiff a Global Assessment of Function ("GAF") score of 65 and diagnosed her with major depressive order, recurrent, unspecified. *Id.*; see Diagnostic & Statistical Manual of Mental Disorders § 296.30 (4th ed. text rev. 2000). Dr. Ali saw Plaintiff again on July 8, 2008, prescribed Xanax, and increased Plaintiff's dosage of Cymbalta. R. at 281. By Plaintiff's July 28, 2008 visit, Plaintiff was feeling less anxious and depressed. *Id.* Dr. Ali's notes indicate that Plaintiff also was laughing and joking. *Id.* One month later, on August 28, 2008, Dr. Ali noted that Plaintiff was "stable" and decreased Plaintiff's dosage of Cymbalta. R. 281, 286.

On October 9, 2008, Dr. Ali recorded that Plaintiff was experiencing mood swings and had anxiety about her memory. R. at 280. On November 24, 2008, Dr. Ali noted that Plaintiff's

mind was racing; she increased Plaintiff's Cymbalta dosage. R. at 280, 286. Plaintiff was less anxious and "coping well" on December 8, 2008. R. at 280.

At some point after her December visit with Dr. Ali but before her January 2009 appointment, [2] Plaintiff submitted an undated Disability Report to the Social Security Administration ("SSA"). R. at 181-88. In this report, Plaintiff stated that she suffers from major depression, panic attacks and an anxiety disorder. R. at 182. (Plaintiff did not mention her other medical conditions.) She characterized these conditions as "chronic" and stated that she feels "like she's on pins and needles all the time." *Id.* Plaintiff noted that she is "constantly talking to [her]self to get out of [her] state of chaos," and explained that she has difficulty leaving her house if conditions are not perfect. *Id.* Plaintiff also stated that she "feel[s] the need to protect [her]self" when she is in a work environment, and that she "can no longer handle stressful situations." *Id.*

Notwithstanding Plaintiff's pessimistic self-report, Dr. Ali's notes from Plaintiff's January 6, 2009 appointment indicate that Plaintiff was doing well. See R. at 279. She was not as anxious and depressed, and was laughing and smiling. *Id.* Plaintiff continued to feel less anxious and was coping well during her February 24, 2009 visit. *Id.*

On February 22, 2009, Plaintiff submitted a Function Report to the SSA. See R. at 192-201. In this report, she indicated that she "spend[s] a lot of time talking to [her]self in [her] head" and "feel[s] like [she's] in a spin." R. at 192. She further noted that she felt "stressed most of the time." *Id.* Plaintiff stated that her Cymbalta "helps to settle down [her] anxious thoughts," and that she also takes Xanax "if needed." *Id.* She indicated that she has "racing negative thoughts" that keep her awake at night, but that Xanax helps her relax. R. at 193.

---

[2] The report indicates that Plaintiff's last visits with both Dr. Ali and Dr. Perry occurred in "12/2008," which suggests that the undated report (1) post-dated her December 8, 2008 appointment with Dr. Ali and (2) pre-dated her January 6, 2009 appointment with Dr. Ali. See R. at 185.

Plaintiff reported that she lives alone and is able to dress herself, bathe, cook, do laundry, clean, shop, and pay bills online, though she must talk to herself or read to encourage herself to complete house and yardwork. See R. at 192-95. She stated that she goes out alone and is able to drive but is afraid to drive long distances. R. at 195. Plaintiff indicated that she goes out three to four times a week to engage in activities such as eating lunch with friends, seeing her grandchildren, and attending school. R. at 195-96. She also noted, however, that although she has no problems getting along with others, she is not as social as she used to be and must "leave the situation" "if there is any confrontation." R. at 197. She described her memory as "not as good," and noted that she gets distracted often and does not finish what she starts. R. at 197. She claimed that she can follow written instructions but needs to write down spoken ones. *Id.*

Plaintiff saw Dr. Ali again on March 19, 2009. See R. at 409. After that visit, Dr. Ali completed a Psychiatric Report for the SSA. See R. at 409-12. In the report, Dr. Ali reaffirmed Plaintiff's diagnosis of major depressive disorder and decreased Plaintiff's GAF score to 50. R. at 409. Dr. Ali did not make any observations about Plaintiff's general presentation (noting, "I am a psychiatrist," R. at 409), but described Plaintiff as "markedly depressed" with a thought process affected by crying, depression, and distorted reality caused by over-obsessing, R. at 410, and noted that "[t]hroughout the session, client was sobbing and crying." R. at 411. Dr. Ali also found that Plaintiff's thought content included feelings of guilt, worthlessness, hopelessness, and helplessness. R. at 410. Dr. Ali found that Plaintiff was oriented to time, place, and person, and the report indicates that Plaintiff accurately answered Dr. Ali's questions aimed at assessing her mental capacity. See R. at 410-11. Dr. Ali noted, however, that Plaintiff commented that thinking about the questions was "causing [her] a lot of stress." R. at 410. Dr. Ali concluded that Plaintiff has serious limitations in (1) completion of household duties, (2) carrying out

instructions, (3) responding appropriately to supervision, coworkers and customary work pressures, and (4) performing tasks on an autonomous and sustained basis (day/week) without undue interruptions or distractions. R. at 411-12.

Plaintiff attached to Dr. Ali's report a handwritten note that echoed her previous Disability and Function Reports. See R. at 405-08. In the note, Plaintiff described her anxiety, fear of making commitments, obsessive-compulsive tendencies, and inability to deal with stress. See *id*. Plaintiff noted that she has "some good days and some bad," and indicated that she "is thankful for [her] depression medication and anti[-]anxiety medication because most of the time it balances [her] out." R. at 406. Sometimes, she noted, she thinks that "relaxation can only be realized by leaving this world," but again indicated that her "meds and therapy pull [her] out of that darkness." R. at 407.

Consultative psychologist Dr. Glen Wurglitz examined Plaintiff on April 1, 2009. See R. at 433-37. Dr. Wurglitz characterized Plaintiff's recall of her personal history as "very good" and her short-term and working memories as "good." R. at 433. Plaintiff's flow of thought "was on the fast side of the normal range," but her "associations were goal-directed" and her speech quality was "good." *Id.* Dr. Wurglitz noted that although Plaintiff arrived promptly and was polite and well groomed, she described her mood as "all stressed out," had a "constricted affect frequently giving way to tears," made only "variable" eye contact, and "due to [her] frequent need to be reassured, she was moderately difficult to engage." R. at 433-34. Dr. Wurglitz opined that "she presented as believable," R. at 434, assigned a GAF score of 55, R. at 437, and diagnosed her with "Bipolar I Disorder, Most Recent Episode Depressed, Moderate." *Id*. Dr. Wurglitz's mental status examination of Plaintiff led him to conclude that Plaintiff, who "had no difficulties maintaining focused concentration throughout" and "put forth good effort on each

task given her," "demonstrated good judgment in solving problems, and evidence of abstract thought," was "able to perform all simple and complex activities of daily living independently," and was "capable of managing her own funds without assistance." R. at 437.

On April 16, 2009, SSA consultant Dr. Darrell Snyder, Ph.D., reviewed Plaintiff's record. Dr. Snyder summarized Dr. Ali's and Dr. Wurglitz's findings, noting that he accorded "great weight" to "examining source" Dr. Wurglitz. R. 425. Dr. Snyder also considered Plaintiff's February 22, 2009 Function Report, to which he ascribed "[p]artial credibility." *Id.* Dr. Snyder concluded that Plaintiff suffers from "bipolar," "[a] medically determinable impairment * * * that does not precisely satisfy the [affective disorders] diagnostic criteria." R. at 416. Dr. Snyder further concluded that Plaintiff has mild limitations in activities of daily living and maintaining social function. R. at 423. He found moderate limitations in her ability to maintain concentration, persistence or pace; understand, remember, and carry out detailed instructions; complete a normal workday or workweek without interruptions; interact appropriately with the general public; and respond appropriately to changes in the work setting. R. 423, 427-28. Nonetheless, he concluded, Plaintiff would be able to perform simple, repetitive tasks of three to four steps in a predictable work setting with no greater than average stress or pressure for production. R. at 429. Dr. Snyder further opined that Plaintiff's customer contact should be restricted, coworkers should be few and consistent, and her supervisor should be supportive, especially initially. *Id.* Dr. Snyder's April 22, 2009 Disability Determination deemed Plaintiff not disabled. R. at 62.

Plaintiff saw Dr. Ali again on April 30, 2009. R. 503. Dr. Ali recorded that Plaintiff had anxiety and ambivalence about everything and was disappointed that her request for disability insurance benefits had been denied. R. at 503.

Plaintiff submitted to the SSA a second, undated Function Report that is grouped with documents dated June 18, 2009. See R. 215-28. This Function Report largely echoes Plaintiff's February 22, 2009 submission. Plaintiff reported that she often needs to talk herself into getting out of bed in the morning. R. at 219. Once up, she typically reads, takes care of her dogs, organizes her house, runs errands, visits her family, and participates in an online marketing class. R. at 220. When her panic and anxiety take over, she wrote, she is "dysfunctional for many hours until [she] can talk [her]self through the situation"; if her panic and anxiety are "real bad," she takes her anti-anxiety medication, stays in her room, and prays that the situation will improve. *Id.* Plaintiff reported having anxiety about food and money in particular. R. at 221-23. She further reported that "[s]ometimes the smallest details send [her] into a spin that could last for days." R. at 225. She also reported "feelings of paranoia about everything." R. at 226. In response to a question on the form asking how she handles stress and changes in routine, she said "not well." *Id.* She also noted that although her attention span "seems to be shortened," she can follow written instructions and short spoken instructions "very well," and longer spoken instructions moderately well. R. at 225.

Dr. Ali increased Plaintiff's Cymbalta dosage on August 6, 2009. R. at 503. Dr. Ali also prescribed Xanax and Abilify at this visit. R. at 505.

On August 12, 2009, Perry, Plaintiff's therapist, prepared a two-page handwritten treatment summary. R. at 454-55. Perry also prepared a substantially similar "revised" report on August 17, 2009. R. at 457-58. Both treatment summaries indicate that Perry diagnosed Plaintiff with major depressive disorder, single episode, moderate. R. at 454, 457; see Diagnostic & Statistical Manual of Mental Disorders § 296.22 (4th ed. text rev. 2000). The treatment summaries indicate that as of August 2009, Plaintiff was taking Abilify and Cymbalta

for her depression and had taken Lexapro, Effexor, Prozac, and Prestique in the past. R. at 454; 457. Perry noted that the "[m]edication provides relief," R. at 454, and that Plaintiff, "with medication[,] is fairly stable for varying lengths of time." R. at 457. Perry also noted in the original but not the revised summary that Plaintiff "tends to stop taking meds when she is feeling better; then she has a relapse and resumes taking meds." R. at 454. In both summaries, Perry noted that Plaintiff "does interact socially, but her extreme sensitivity to others' opinions causes her to be easily hurt, and as a result she often avoids social interaction." R. at 455, 458. Perry also reported that Plaintiff becomes insecure and anxious in new situations, and that these feelings hinder Plaintiff's ability to establish a new routine. R. at 455, 458. The record does not contain treatment notes documenting Plaintiff's bi-weekly sessions with Perry.

On September 7, 2009, a state agency psychologist, Dr. Donna Hudspeth, Psy. D., reconsidered the record, inclusive of the updates from Dr. Ali and Sue Perry. See R. at 474-76. Dr. Hudspeth determined that although "[a]nother review of the prior initial decision * * * was appropriate," the additional evidence "was consistent with the findings and limitations of" Dr. Snyder's April 2009 assessment. R. at 476. Dr. Hudspeth noted that "[t]he issue of credibility has not changed." *Id.*

On October 8, 2009, state agency medical consultant Dr. Victoria Dow, M.D., assessed Plaintiff's physical residual functional capacity. R. at 466-73. Dr. Dow considered Plaintiff's physical ailments and pain and concluded that she should be subject to a few exertional limitations. R. at 467. Dr. Dow did not place any postural, manipulative, visual, communicative, or environmental limitations on Plaintiff. See R. at 468-70. Dr. Dow opined that the severity of Plaintiff's alleged symptoms was consistent with the medical and nonmedical

evidence in the record, R. at 471, and deemed Plaintiff's statements and allegations "partially credible." R. at 473.

Plaintiff returned to Dr. Ali's office on November 5, 2009. R. at 503. Dr. Ali noted that Plaintiff had run out of medication but was "coping better." *Id.* Dr. Ali discussed cognitive behavioral therapy with Plaintiff, *id.*, and refilled her prescriptions for Cymbalta, Xanax, and Abilify. R. at 505. On January 4, 2010, Plaintiff had run out of Abilify but was stable. R. at 502. After Plaintiff's March 15, 2010 visit, Dr. Ali reported that Plaintiff was doing well on Abilify, was less anxious, and wanted to increase her dosage of Abilify. *Id.*

By June 16, 2010, however, Plaintiff had not taken her Abilify for two months because "insurance had not filled it." R. at 501. Plaintiff also reported decreasing her dosage of Cymbalta by 50% but did not give a reason for that. R. at 536. Plaintiff was "very tearful," "extremely depressed," felt "hopeless," and confessed suicidal ideations. R. at 501, 536. Plaintiff reported significant stress and anxiety about her financial situation. R. at 536. Dr. Ali's colleague, Dr. Syed Ali, contacted Plaintiff's daughter, who came to the office. R. at 501, 536. Dr. S. Ali assigned Plaintiff a GAF score of 20-30, diagnosed her with major depressive disorder, ruling out bipolar disorder, and admitted Plaintiff to an inpatient program at Linden Oaks. R. at 501, 536.

Plaintiff was stabilized in the inpatient setting and was transferred to the partial hospitalization program on June 20, 2010. R. at 535. By June 24, Plaintiff requested to be transferred to the outpatient setting. *Id.* She was discharged fully from Linden Oaks on July 16. R. at 532.

During Plaintiff's hospitalization, on June 20, 2010, Perry prepared a Mental Impairment Report that included a functional capacity assessment. See R. at 520-27. Perry diagnosed

Plaintiff with major depressive disorder, recurrent, moderate, and generalized anxiety disorder. R. at 521. Perry opined that three of Plaintiff's previous hospitalizations were due to her perceived stress in work situations, while the most recent was triggered by financial concerns. R. at 522. Perry stated that "[d]espite medication, which is monitored regularly by Dr. Fatima Ali, the sense of hopelessness and high anxiety are rarely absent," and that Plaintiff "remains stable for only short periods of time." *Id.* Perry did not believe that Plaintiff was malingering or over-exaggerating her symptoms. R. at 522. Perry described Plaintiff's functional limitations as "difficulty adjusting to new situations, fearful of letting others down, * * * difficulty concentrating, lack of confidence in self," and difficulties making decisions and following directions. *Id.* Perry found that Plaintiff was "markedly limited" or "moderately limited" in all but three areas: the ability to ask simple questions or request assistance, the ability to maintain socially appropriate behavior, and the ability to be aware of normal hazards and take appropriate precautions. R. at 523-24. Perry concluded that Plaintiff "would be unable to function in a work setting" because "[s]he does not appear to have the self[-]discipline nor the mental or emotional stamina to carry out the responsibilities and routine that a work situation requires." R. at 525.

## C.      October 22, 2010 Hearing

Plaintiff appeared before an ALJ for a hearing on October 22, 2010. Plaintiff described her disabilities as depression, panic attacks, and anxiety, though she noted her physical ailments as well. R. at 33-34. She stated that her medication "helps a lot" and she does not experience adverse side effects, though she had a panic attack the day before the hearing. R. at 35-36. She reported no problems sitting, standing, walking or carrying things. R. at 44.

Plaintiff testified that she left her former employment "after an employee buyout," but also because the environment was too stressful and she no longer had the strength to "deal with

it." R. at 32, 50-51. Toward the end of her employment, she was absent approximately three days per month. R. at 50. Plaintiff testified that after she left her employment, she pursued and earned an Associate's degree. She stated that she had some difficulties in earning her Associate's degree, and skipped class sometimes when she did not understand or complete her homework, but mainly earned Bs and Cs with an occasional A. R. 30-32, 46.

Plaintiff testified that she is able to drive to appointments, the grocery store, and her family's homes as well as complete other errands, but she is afraid to drive long distances. R. at 35. Also, she pays bills, does chores and laundry, and is "happy" while cleaning. R. at 32, 52. Plaintiff found employment since her alleged onset date, but left after working only three days because traffic made it difficult for her to arrive on time. R. at 49-50. She also started working for her son-in-law's sign shop, but, after finding the work too complicated, volunteered to clean and file paperwork instead. R. at 53-54.

Plaintiff stated that she tries to talk to her daughter every other day, and occasionally attends social events and parties. R. at 37-38. Plaintiff's daughter hosts family parties since hosting responsibilities have become too stressful for Plaintiff. R. at 38. Approximately once a month, Plaintiff has lunch with friends and quilts with a group. *Id*. She has completed eight quilts of various sizes in approximately a year. R. at 40. She does not have panic attacks at these types of places because they are not confrontational and there are no expectations. R. at 39.

Grace Gianforte, a vocational expert ("VE"), also testified at the hearing. See R. at 54-61. The ALJ presented the VE with a hypothetical of a person of Plaintiff's age, education and work history. R. at 55. The VE was to assume that the person can perform medium work and has the capacity to perform simple, routine tasks in a predictable work setting with no greater

than average stress or pressure for production. *Id.* The individual should have no more than brief and superficial contact with the public, her coworkers should be few in number and consistent in temperament, and her supervisor should be supportive, especially initially. R. at 55-56. The VE testified that this hypothetical individual could not engage in Plaintiff's past relevant work. R. at 56. However, the VE concluded that this individual could perform other medium-level work as a hospital cleaner, dishwasher, and cook helper, of which there are 3,000, 8,000 and 5,000 jobs in the regional economy, respectively. R. at 56-57.

When questioned by Plaintiff's attorney, the VE testified that missing three days of work per month – as Plaintiff did toward the end of her tenure at her previous job – would preclude the same hypothetical person from working in those occupations. R. at 57. Additionally, in response to questions about the limitations contained in Perry's June 2010 assessment, the VE testified that it would be "work preclusive" if a person were capable of performing activities within a schedule and maintaining regular attendance only 75% of the time. R. at 59.

## III.    Disability Standard

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment not only must prevent her from doing her previous work, but, considering her age, education, and work experience, it also must prevent her from engaging in any other type of substantial gainful

activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. 404.1520(e)-(f), 416.920(e)-(f).

Social Security regulations enumerate a five-step inquiry to evaluate whether the claimant is entitled to disability insurance benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see, *e.g.*, *Lott v. Colvin*, --- F. App'x ---, 2013 WL 5630633, at *2 (7th Cir. Oct. 16, 2013). At Step 1, the ALJ determines whether the claimant is engaged in substantial gainful activity; if he or she is, the claim is denied. If not, the inquiry proceeds to Step 2, at which the ALJ assesses whether the claimant has an impairment or combination of impairments that are severe. If so, the inquiry proceeds to Step 3, where the ALJ determines whether the impairment(s) meet or equal a listed impairment in the appendix to the regulations. If yes, the claimant is automatically considered disabled; if no, then the inquiry proceeds. Before Step 4, the ALJ determines the claimant's residual functional capacity ("RFC"), which is "what an individual can still do despite his or her limitations." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting SSR 96-8p). The ALJ must assess the RFC based on all the relevant evidence of record. C.F.R. § 404.1545(a)(1). At Step 4, the ALJ then assesses whether the claimant can do the claimant's past relevant work given the claimant's RFC. At the final step, Step 5, the ALJ determines whether the claimant can perform other work given the claimant's RFC, age, education, and experience. If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

The claimant bears the burden of proof at Steps 1-4; the burden at Step 5 is on the Commissioner. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**IV.    The ALJ's Opinion**

In an opinion dated November 23, 2010, the ALJ concluded that Plaintiff is not disabled. R. at 10.  At Step 1, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since August 1, 2005, the alleged onset date. R. at 12. At Step 2, the ALJ found that Plaintiff has the following severe impairments: depression, anxiety, panic attacks, a heart condition, and obesity. *Id*. At Step 3, the ALJ determined that Plaintiff's combination of impairments does not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 13.

Before Step 4, the ALJ found that Plaintiff has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except that Plaintiff should be limited to only the performance of simple, routine tasks in a predictable work setting, with no greater than average stress and pressure for production.  *Id*.  The ALJ added that Plaintiff should have no more than brief and superficial contact with the public and that her coworkers should be few in number and consistent in temperament.  *Id.*  The ALJ also found that Plaintiff's supervisor should be supportive, especially initially. *Id*.

In reaching this RFC conclusion, the ALJ briefly considered Plaintiff's undated Disability Report (to which she referred as the "January 2009" report).  R. at 16, 188.  She then explored, in depth, Plaintiff's testimony from the October hearing.  R. at 16-17.  The ALJ concluded that "[i]n terms of the claimant's depression and anxiety, the objective medical record does not support greater restriction than that found in my residual functional capacity determination."  R. at 17.  While acknowledging Plaintiff's significant history with depression, the ALJ reasoned that the record demonstrates that Plaintiff is able to well manage her mental impairments with

medication and treatment. *Id.* The ALJ also discussed Dr. Wurglitz's consultative examination, though she did not make specific note of Plaintiff's need to be reassured during the exam. *Id.*

The ALJ summarized Plaintiff's periods of exacerbation, including her only post-onset-date hospitalization of June 2010. R. at 18. The ALJ specifically noted the GAF score of thirty that Dr. S. Ali assigned at that time. R. at 18. However, the ALJ also noted Plaintiff's past GAF scores of fifty to sixty and Dr. F. Ali's score of sixty-five, which she concluded was "more representative of the claimant's mental condition with the proper treatment and compliance to the prescribed medication regimen." *Id.* She added that the record indicates that Plaintiff's period of exacerbation in 2010 was the result of noncompliance with that regimen. *Id.* The ALJ also mentioned Perry's note that Plaintiff is stable on medication. R. at 19.

The ALJ gave great weight to the assessments of consultants Dr. Snyder and Dr. Dow, finding them to be informed and consistent with the record. R. at 20. She declined to rely on therapist Sue Perry's opinion. *Id.* The ALJ specifically referenced Perry's statement that Plaintiff would be unable to function in a work setting due to her lack of mental and emotional stamina. *Id.* The ALJ found Perry's assessment inconsistent with the record as a whole as well as with her own treatment records, again citing Perry's note that Plaintiff is stable with medication. *Id.* The ALJ did not discuss Dr. Ali's March 19, 2009 Psychiatric Report.

The ALJ found Plaintiff "generally credible," but concluded "that her allegations of disability are in part, in excess of her actual residual functional capacity." R. at 19. After carefully considering the evidence, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the ALJ's RFC. *Id.* Specifically, the ALJ

stated that although she appreciates Plaintiff's symptoms, "the testimony and medical assessments of treating and examining physicians, demonstrates that the claimant is sufficiently able to concentrate, focus, and perform simple work related tasks." *Id.* at 20. The ALJ cited four reasons for her partially adverse credibility finding: (1) Plaintiff successfully began and completed her Associate's degree after her alleged onset date; (2) Plaintiff volunteered at her son-in-law's business; (3) much of Plaintiff's anxiety is a result of her finances; and (4) Plaintiff is stable while maintaining her medication regimen. R. at 19-20.

At Step 4, the ALJ determined that Plaintiff is unable to perform any past relevant work in light of her current RFC. R. at 21.

At Step 5, the ALJ considered Plaintiff's age, education, work experience, and RFC, and concluded that Plaintiff is able to perform jobs that exist in significant numbers in the national economy. *Id.* The ALJ did not at this or any other juncture consider the VE's testimony that a person who missed three days of work per month would be unable to perform these jobs.

## V.    Standard of Review

The Social Security Act authorizes judicial review of the final decision of the SSA and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence. See *Pepper*, 712 F.3d at 361; *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012); *Shauger v. Astrue*, 675 F.3d 690, 696-97 (7th Cir. 2012); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971); *Pepper*, 712 F.3d at 361; *Kastner*, 697 F.3d at 646; *Shideler*, 688 F.3d at 310; *McKinzey*, 641 F.3d at 889.

A court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its own judgment for that of the ALJ. See *Pepper*, 712 F.3d at 362; *Shideler*, 688 F.3d at 310; *Rucker v. Astrue*, 404 F. App'x. 844, 845 (7th Cir. 2011); *McKinzey*, 641 F.3d at 889; *Simila v. Astrue*, 573 F.3d 503, 513-14 (7th Cir. 2009). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and were made under the correct legal standard. See *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). Even if reasonable minds could differ concerning whether the claimant is disabled, a reviewing court will affirm so long as the ALJ applied the correct legal standard and substantial evidence supported the decision. See *Shideler*, 688 F.3d at 310; *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011); *Simila*, 573 F.3d at 513-14.

The ALJ must build "an accurate and logical bridge" from the evidence to her conclusion. See, *e.g.*, *Kastner*, 697 F.3d at 646 (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). If the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," a remand is required. *Kastner*, 697 F.3d at 646 (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002); see *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012). While the ALJ "need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion" and "may not ignore entire lines of contrary evidence." *Id*; see *Pepper*, 712 F.3d at 361-62; *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

## VI.    Analysis

Plaintiff makes four arguments as to why the ALJ's decision should be overturned: (1) the ALJ 's decision is unsupported by substantial evidence;  (2) the ALJ failed to consider favorable evidence – Dr. Ali's March 19, 2009 psychiatric evaluation and Plaintiff's second self-report; (3) the ALJ failed to accord appropriate weight to the opinions of Plaintiff's treating psychiatrist and therapist; and (4) the ALJ's credibility finding was patently erroneous.   The Court considers these arguments in reverse order.

### A.    ALJ's Credibility Finding

Plaintiff contends that the ALJ's credibility findings are "fatally flawed" for a variety of reasons.  [10] at 15.  The Court respectfully disagrees.

Because ALJs are uniquely positioned to observe claimants' testimony, their credibility determinations are entitled to special deference.  *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).   Accordingly, the Court does not overturn the ALJ's credibility determination unless it is patently wrong.  *Schomas*, 732 F.3d at 708.  In other words, the assessment stands as long as it has some support in the record.  *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008).

Here, although the ALJ's credibility determination includes boilerplate that frequently has been criticized by the Seventh Circuit, see, *e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012), the Court cannot conclude that her determination was "patently wrong."  See *Pepper*, 712 F.3d at 367-68 (upholding the credibility finding notwithstanding use of the boilerplate language where the ALJ offered specific reasons to disbelieve the claimant's testimony).   To the contrary, the ALJ's determination that Plaintiff was "generally credible" but

in some respects overstated the impact of her symptoms on her functional capacity is grounded in Plaintiff's testimony and other record evidence.

The ALJ thoroughly considered Plaintiff's testimony about her degree, including the weekly nature of her classes, R. at 16, her social interaction with family and her quilting group, and her volunteer work outside the home, and reasonably determined that Plaintiff is "able to perform work related activities" of the nature outlined by the VE. Plaintiff's volunteer work in a family business may not be closely analogous to working in a competitive environment, but the ALJ was not patently wrong in considering this activity as some evidence that Plaintiff's assessment of her abilities did not align with her objective capabilities. See *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Similarly, the Court finds no error in the ALJ's failure to mention Plaintiff's attempt to work at the family business, see [10] at 14, or her failure to specifically discuss certain factors mentioned in SSR 96-7p; "an ALJ need not mention every piece of evidence, so long as he builds a logical bridge from the evidence to his conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The bridge that the ALJ built regarding Plaintiff's credibility was logical and well-supported by record evidence of Plaintiff's ability to (1) perform work-related, school-related, and daily-living tasks and (2) to function at a higher level when following her medication regimen, notwithstanding her self-reports of constant anxiety and racing thoughts.

### B.     Failure to Consider and Accord Appropriate Weight to Evidence

Plaintiff next contends that the ALJ erred in failing to consider (and thus give appropriate weight to) the opinion of Dr. Ali, Plaintiff's treating psychiatrist. See [10] at 12-14. Plaintiff also objects to the ALJ's decision to give "little weight to the opinion of the claimant's therapist, Ms. Sue Perry, LMFT," R. at 20, and her failure to "discuss the lengthy self-report of Ms.

Infusino as to her ability to handle stress or criticism and its exacerbative [e]ffect upon her activities and functioning." [10] at 12. Plaintiff's opening brief also suggests[3] that the ALJ erred in failing to consider (or explain why she rejected) the VE's testimony that missing three days of work per month, or consistently performing only 75% of the time, would be work preclusive. Although the ALJ's opinion is, on the whole, very thorough and detailed, the Court agrees that the ALJ erred in failing even to mention Dr. Ali's report, explain why she did not accord it any weight, or clarify why she did not credit either Plaintiff's or the VE's testimony about Plaintiff's ability to regularly attend work.

Although an ALJ is not required to discuss every piece of evidence in the record, she must address "highly pertinent evidence." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *cf. United States v. Womack*, 732 F.3d 745, 747 (7th Cir. 2013) (noting that in imposing sentence in a criminal case, the district court must "address all of the defendant's principal arguments that 'are not so weak as to not merit discussion'"). To the extent that such pertinent evidence consists of the medical opinion of a treating physician, the ALJ must accord it controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2). If the ALJ discounts the medical opinion of a claimant's treating physician, the ALJ must offer "good reasons" or a "sound explanation" for doing so. *Id*; *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). Treating

---

[3] The Court uses the term "suggests" because Plaintiff's brief discusses the VE's testimony at length in the facts section, [10] at 3-4, but only vaguely alludes to Plaintiff's inability to sustain a regular work schedule in the argument section. See *id.* at 10. Failure to fully develop arguments may result in their waiver or forfeiture, see, *e.g.*, *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013), but the Court declines to find either here as Plaintiff flagged the issue just enough to keep it alive. On remand, the ALJ should incorporate into her analysis an assessment of Plaintiff's testimony that she typically missed 3 days of work per month in her job at the phone company and the VE's testimony that such absences, if repeated in a new job, would be work-preclusive. See, *e.g.*, *Punzio*, 630 F.3d at 709-10.

sources' opinions about issues reserved to the Commissioner, such as opinions that a claimant is disabled or lacks residual functional capacity, are not accorded any special significance. 20 C.F.R. § 404.1527(d)(3). Likewise, as Plaintiff has recognized, see R. at 57-58; [10] at 14, opinions from non-physician providers, such as therapists, are not entitled to controlling weight, though they may be considered to show the severity of an impairment and how it affects a claimant's ability to work. See 20 C.F.R. §404.1513(d); SSR 06-03p; see also *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004).

The Court finds no error in the ALJ's failure to delve deeply into Plaintiff's second self-report. The ALJ specifically acknowledged that "[t]he medical record contains self-written *notes* of the claimant detailing her anxiety, ongoing emotional conflict, compulsiveness about details, difficulty being around others, and difficulty dealing with stress." R. at 18-19 (emphasis added). The emphasized language, along with the ALJ's citations to pages of the administrative record containing Plaintiff's second self-report, see R. at 19 (citing pages 8-11 of Exhibit 17F), and her reliance on Dr. Snyder's opinion, which expressly referenced Plaintiff's self-report, R. at 20, 425, indicate that the ALJ did review and consider both of Plaintiff's self-reports. The ALJ was not required to discuss Plaintiff's second report more thoroughly than this; her summary indicates her appreciation of the contents of the reports, and she devoted a significant portion of her lengthy opinion to the consideration of Plaintiff's testimony and self-reported impairments.

The Court also finds no error in the ALJ's decision to accord "little weight" to Perry's reports. The ALJ was entitled to reject Perry's conclusions that Plaintiff was unable to function in a work setting. Such determinations are the province of the Commissioner. 20 C.F.R. § 416.927(e)(2)(i). Perry's assessments that Plaintiff's mental illness makes it difficult and often impossible for her to adjust to new situations and follow directions were inconsistent with some

of the medical evidence in the case. For instance, Dr. Wurglitz examined Plaintiff and concluded that she "had no difficulties maintaining focused concentration throughout," "put forth good effort on each task given her," and "demonstrated good judgment in solving problems, and evidence of abstract thought." R. at 436-37. The ALJ also noted that Plaintiff's own testimony undermined Perry's restrictive assessment, and found "compelling" Plaintiff's post-onset-date completion of a fast-track Associate's degree program. R. at 19. Notably, the ALJ credited Perry's chronologies of Plaintiff's "significant history with depression." R. at 17.

The Court is more troubled by the ALJ's failure to discuss treating psychiatrist Dr. Ali's[4] March 19, 2009 "Psychiatric Report" – a report that was completed on an SSA-provided form. See R. at 409-12. The Commissioner concedes that this report was overlooked, [17] at 8, but contends that "any error in this regard is harmless" in light of the ALJ's lengthy discussion of Dr. Ali's notes documenting Plaintiff's 2010 hospitalization and other contemporaneous treatment notes. The Court disagrees.

The record contained evidence from Plaintiff's treating psychiatrist that might have supported an award for Plaintiff, but the ALJ passed over it in silence. Plaintiff "is entitled to have all the evidence fairly weighed, and the reviewing court cannot do its job without the agency's explanation." *Mueller v. Astrue*, 493 F. App'x 772, 777 (7th Cir. 2012). Given the voluminous record, the length of time over which it was compiled, and the number of treaters, consultants, and therapists whose views are reflected in it, the Court recognizes the difficulty inherent in the ALJ's task of trying to sort through and address every significant point. Although the ALJ missed a few of those points, her thirteen-page, single-spaced opinion reflects substantial effort that the Court recognizes. At the end of the day, however, the ALJ is required

---

[4] It is unclear whether this form was completed by Dr. Fatima Ali or Dr. Syed Ali.

to give due consideration to the evaluations of Plaintiff's treating psychiatrist, or articulate a good reason why doing so was not appropriate in this case. *Punzio*, 630 F.3d at 710. Perhaps there was a perfectly good reason for not according controlling weight to or otherwise discounting Dr. Ali's March 19, 2009 report. If so, it was incumbent upon the ALJ to articulate that reason; we cannot in our limited review guess at or supply it. Accordingly, the Court remands this matter to give the ALJ the opportunity to review the March 19, 2009, and other treatment notes of Dr. Ali, and consider the weight they should be given in the context of the record as a whole.

### C.     Substantial Evidence

Plaintiff's final argument is that the ALJ's opinion is not supported by substantial evidence. See [10] at 9-11.[5] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bates*, 736 F.3d at 1098 (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). Substantial evidence is more than a scintilla, but it may be less than a preponderance. *Schmidt v. Astrue*, 496 F.3d 833, 841-42 (7th Cir. 2007). Thus, even if reasonable minds could differ as to the ultimate conclusion that a claimant is disabled, the Court is constrained to affirm the decision of the ALJ. *Schmidt*, 496 F.3d at 842.

---

[5] To the extent that Plaintiff argues that there was no substantial evidence supporting the ALJ's decision because "[i]t is beyond the power of a Social Security Judge or a vocational expert to predict that a work environment or the employees therein could be so supportive or predictable," [10] at 10 (emphasis omitted), the Court notes that at least one court has reversed an ALJ decision for *failing* to account for a claimant's need for "less demanding, highly structured, and supportive environments." *Harris v. Astrue*, 2012 WL 5930597, at *9 (N.D. Ind. Nov. 26, 2012); *cf. Flint v. Colvin*, --- F. App'x ---, 2013 WL 6171015, at *1-2 (7th Cir. Nov. 26, 2013) (approving the ALJ's introduction into the hypothetical presented to the VE the similarly subjective limitation that the claimant have "reasonable access to a bathroom"). The Court also notes that Plaintiff's counsel incorporated the very same limitations to which Plaintiff now objects in his follow-up questions to the VE. See *id.* at 58-60.

The record as a whole might reasonably be read to meet this standard had the ALJ not erred in overlooking Dr. Ali's report and the potentially work-preclusive nature of Plaintiff's history of frequent absences from work. However, without an assessment of those arguments, the Court cannot conclude that her opinion rests on substantial evidence. Nor can the Court conclude that the evidence overwhelmingly supports a finding of disability. Accordingly, the proper course is to remand the matter to the agency for further consideration of the record evidence. See *Rucker v. Astrue*, 414 F. App'x 844, 845 (7th Cir. 2011).

## VII. Conclusion

For the reasons stated above, the Court grants in part Plaintiff's motion for summary judgment [9] and remands the case to the ALJ for further proceedings consistent with this Opinion.

Dated: 01/23/2014 

Robert M. Dow, Jr.
United States District Judge